STATE of Missouri, Respondent,

v.

Radford Napoleon GRAY, Appellant.

No. KCD26362.

Missouri Court of Appeals,
Kansas City District.

June 19, 1973.

Motion for Rehearing and/or Transfer
Denied July 23, 1973.

Willard B. Bunch, The Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant; Paul T. Miller, Executive Director, Kansas City, of Counsel.

John C. Danforth, Atty. Gen., David Robards, Asst. Atty. Gen., Jefferson City, for respondent.

Before DIXON, C. J., PRITCHARD, J., and LAURENCE R. SMITH, Special Judge.

LAURENCE R. SMITH, Special Judge.

A jury found defendant guilty of the forcible rape of the prosecutrix, who was 17 at the time of occurrence, and fixed his punishment at 10 years imprisonment. Defendant appeals from the 10-year sentence subsequently imposed.

Defendant's sole claim of error on this appeal is that the State's evidence was insufficient in that there was no evidence that defendant put the prosecutrix in fear or that defendant forced her to have intercourse with him. The trial court overruled defendant's motions for acquittal made at the close of the State's evidence and again at the close of all the evidence.

Defendant relied on an alibi defense. Details as to the rather bizarre happenings are somewhat incomplete. The prosecutrix was the only one who testified as to the occurrence and the events leading up to same. She testified that at 10:00 p.m. on the night of April 21, 1971 she was watching TV at her home at 3524 Flora, in Kansas City, Missouri, when a boy named Lawrence came to the house to get the prosecutrix's girl friend. The prosecutrix walked her girl friend down to the car. A man called "Fats" (a brother of defendant) had a gun in the back seat of the car. He ordered prosecutrix to get in the car, and she did. Fats asked her where her sister was and said that she had a thousand dollars of his. When the prosecutrix said she didn't know where her sister was, he said that she had better find out because he wanted his money now. He said, "If you don't get my money together, I'll blow your brains out."

The prosecutrix was taken in the car by Fats and two other (unidentified) males to an apartment at 32nd and Highland. She was blindfolded and taken by Fats in another car to another (unidentified) location. Later, Fats, while accompanied by the prosecutrix, hailed a taxicab someplace on Linwood Boulevard. The prosecutrix was not blindfolded at this time. She

knew he had the gun in his pocket. The prosecutrix testified that Fats was using his weapon to keep her in custody. She said she was afraid to tell the cab driver what was happening. She accompanied Fats in the cab to a two-story house at 2615 Chestnut, arriving there about 12:00 midnight. The prosecutrix was not assisted out of the cab. Fats told her to go up to the house. He was right behind her. Fats knocked on the door, and defendant Radford Gray, dressed only in underclothing, came to the door. Defendant said nothing and appeared to have arisen from sleep. Defendant let in Fats and the prosecutrix. Another man, then in the house, was seen to go upstairs. There was a bed and a couch in the room at the entrance. A living room was to the right.

Fats ordered the prosecutrix to take off her clothes. The prosecutrix testified that he did not point a gun but that she knew he had a gun. She did not protest about taking off her clothes. She said she "was scared . . . to try anything." She took off her clothes in the living room. Fats put a pillow on the floor. He called someone on the phone (which was in the living room) and told the prosecutrix to sit on the pillow and suck his penis. She sat on the pillow but refused to suck his penis. Defendant came into the living room, and without saying anything, started pinching the prosecutrix about her breasts and legs. The prosecutrix said that she cried. The prosecutrix kept telling him to stop and knocked his hands away, but defendant just kept on with the pinching until Fats got off the phone. Defendant told Fats that he wanted to have sexual intercourse with the prosecutrix, and Fats said, "just go on and have it."

The prosecutrix testified that defendant inserted his penis into her vagina and had intercourse with her on the bed, which was near the entrance to the house. The prosecutrix said she was not tied down, that no gun was pointed at her; that she did not scream; but that she was scared. She testified that she engaged in the intercourse

against her will. Fats never did display the gun to the defendant. After the intercourse, Fats told the prosecutrix to go upstairs and take a bath, which she did. She was upstairs about fifteen minutes. She did not shout or attempt to escape. When she came down, defendant told her he "wanted to have" her again. She said she didn't want to. She was not threatened because of her refusal. In defendant's presence Fats then blindfolded the prosecutrix and Fats took her away in a car. Some unidentified person was also in the car. Defendant stayed at the house. The prosecutrix was let out of the car at 27th and Prospect. She flagged a cab and went home, arriving there about 3:00 a.m. She told her mother and stepfather that she had been raped. Her stepfather took her to General Hospital, where she was examined and treated. Then she went to the police station that same night (early morning of April 22). She was shown photographs of persons. She said she identified "them" (apparently referring to defendant and Fats) but that she told the police it wasn't "them", because she had been threatened. She testified at the trial that "they threatened to kill me if I told anyone." When asked specifically, at the trial, about defendant, she stated that he had made this threat.

The prosecutrix testified that she was "really afraid" the entire evening in question. She had gone as far as the 11th grade in school. She said she had never been to a party, dance or cocktail party in her whole life, but had been to family reunions. She had never seen defendant at any time prior to her arriving at 2615 Chestnut on the night in question. She had not known Fats personally but had seen him riding in a car prior to this particular night.

When the prosecutrix went back to the police station a day later (on April 23rd) she identified both defendant and Fats from photographs. She also identified defendant at a line-up on April 23rd.

John King, a Kansas City, Missouri policeman, talked with the prosecutrix both at the hospital and at the police station in the early morning of April 22nd. He stated:

"... I had a very, very hard time interviewing (the prosecutrix) at the hospital. Her mother was with her and she was very upset and crying. I thought it best that I get away from the hospital environment and interview her at my office. I thought it would calm her down a little bit. She seemed very scared and when I did get her to the Unit I took the statement from her and even at this—at this point she was very upset."

Medical records from General Hospital, received into evidence, showed that the prosecutrix was at the hospital at 4:30 a.m. on April 22nd. Physical examination showed no acute distress and no abrasions or lacerations, but sperm was found in her vagina.

Carman Johnston, an officer of the Kansas City, Missouri Police, in the polygraph section, testified as to the results of a polygraph examination he administered to defendant. The State and defendant had stipulated that the examination could be made and the results and the examiner's opinion introduced into evidence. During the examination defendant made negative responses to questions as to whether he raped the prosecutrix or knew who had raped her. The officer testified that in his opinion defendant's answers were not truthful.

Testimony of defendant, and other witnesses on his behalf, related to the good reputation of defendant and as to his being elsewhere on the night in question.

The only verdict-directing instruction by which the jury could find guilt was Instruction No. 3, which provided:

"If you find and believe from the evidence beyond a reasonable doubt:

"First, that on the 21st day of April, 1971 . . . the defendant inserted his sexual organ into the sexual organ of (prosecutrix), and

"Second, that he did so against her will and forcibly after she resisted to the utmost of her ability, then you will find the defendant guilty of rape.

" * * * "

■ The judgment of the trial court must be set aside because there was insufficient evidence as to the use of actual force by defendant in accomplishing the sexual intercourse. The State in its brief concedes: "It is clear from the evidence and not disputed by the respondent that actual force in the form of physical violence was not used in perpetrating the rape." Under the instructions given to the jury (quoted *supra*) the only basis for the jury to find guilt was if they found that defendant accomplished the sex act "forcibly after she resisted to the utmost of her ability." This the jury could not find under the evidence.

■ The defendant did not claim error in the instructions either in his motion for new trial or on this appeal. However, the giving of the erroneous instruction constitutes a plain error affecting substantial rights, resulting in manifest injustice, requiring at least a new trial. Rule 27.20(c), V.A.M.R.

Should the defendant be discharged rather than granted a new trial? In answering this question we must first determine a legal question related to the matter of what constitutes *"forcibly* ravishing" within the meaning of the rape statute, Sec. 559.260, RSMo 1969, V.A.M.S.

■ The rule is well established in Missouri that one may be guilty of the rape of a girl over 16 years of age even though she has offered no physical resistance if she submits through fear of personal violence by the defendant to herself or her children. State v. Neal, 484 S.W.2d 270 (Mo.1972); State v. Beck, 368 S.W.2d 490 (Mo.1963). And see proposed Missouri Pattern Instructions—Criminal Par. 6.40.

However, under the evidence presented in the instant case any fear of personal violence was from Fats rather than from defendant, his brother. And no charge was made that the two were acting in concert. The State argues that the present case is closely analogous to that of a man taking advantage of a woman who is asleep, drugged, in a drunken stupor, or mentally incompetent.

In State v. Warren, 232 Mo. 185, 134 S. W. 522 (1911) it was held that one could be guilty of the rape of a consenting woman if it is proved that the woman was of unsound mind, not knowing right from wrong, if the man at the time had knowledge of the mental condition of the woman. In Warren, in which a conviction was reversed and the case remanded for new trial, the court pointed out that the main instruction was erroneous because it did not include as an element of the crime knowledge by the defendant as to the mental condition of the prosecutrix.

Attention is called to an annotation in 31 A.L.R.3d 1227 on "Rape or Similar Offense Based on Intercourse with Woman Who is Allegedly Mentally Deficient." Under the majority view, under which Warren and other Missouri cases are cited (page 1249), actual or constructive knowledge on the part of the accused of the female's sub-normal mentality is an essential prerequisite to a conviction for rape. And see 65 Am.Jur.2d 766, Rape, Secs. 8 and 9, with reference to rape of an unconscious or mentally deficient woman.

Missouri cases have held that carnal connection with a woman asleep can be rape. State v. Stroud, 362 Mo. 124, 240 S. W.2d 111, 112 (1951). In State v. Adams, 380 S.W.2d 362, 367 (Mo.1964), a rape case, it was recognized that threats made by an associate of the defendant could be considered along with the violence and threats of the defendant, where it was "all one associated chain of events."

We reach the conclusion that one may be guilty of rape if his victim submits through fear of physical violence, even if that fear is caused by one other than the defendant, if the defendant at the time has knowledge that his victim is submitting through such fear. Such a defendant in effect adopts, and uses for his own lascivious purpose, the fear engendered by another. Whether the fear is caused by the defendant or another, it is without the consent of the woman and amounts to "forcibly ravishing" within the meaning of the rape statute.

This brings us next to the questions as to whether there was sufficient evidence so that a jury could find (1) that the prosecutrix submitted to defendant because of threats of Fats which caused her to fear physical violence to herself, and (2) that defendant had knowledge at that time that the prosecutrix was submitting because of threats of Fats. In answering these questions the facts in evidence and the favorable inferences reasonably to be drawn therefrom must be considered in the light most favorable to the State, State v. Colthrop, 437 S.W.2d 75, 76 (Mo.1969). We believe both of the above questions must be answered affirmatively. Furthermore, there might be additional evidence to be offered at a retrial.

We believe this is a case for submission to a jury with instructions that to find guilt it must find that defendant's act was done against the prosecutrix's will after she was caused to submit by threats of Fats which caused her to fear physical violence to herself and that defendant at that time had knowledge that she was submitting because of threats of Fats.

Accordingly, the judgment of the trial court is set aside and the case remanded for a new trial.

All concur.